BATES *v.* STATE.

4435                          198 S. W. 2d 850

Opinion delivered January 13, 1947.

Rehearing denied February 10, 1947.

*J. F. Quillin* and *Hal L. Norwood,* for appellant.

*Guy E. Williams,* Attorney General and *Arnold Adams,* Assistant Attorney General, for appellee.

ED F. MCFADDIN, Justice. Vollie Bill Bates was convicted of murder and sentenced to death; and has appealed. This being a capital case, § 4257, Pope's Digest, prescribes the extent of the review. The motion for new trial contains 36 assignments; and, in addition, the transcript discloses other objections made by the defendant in the course of the trial. We group and dispose of all of the assignments and objections in the following headings:

I. *The Filing of the Information and the Swearing of the Jury.* The defendant was tried and convicted in July, 1946. The transcript, as originally filed in this court, failed to show that the information was filed and that the jury was sworn. But by *nunc pro tunc* order of November 12, 1946, the record of the Circuit Court was supplemented and amended to show these essentials. The order *nunc pro tunc* was made after a hearing at which the defendant and his counsel were present, and after the introduction of substantial evidence. There is ample authority in this state to sustain the validity of such *nunc pro tunc* proceedings. Many of our earlier

cases on this point are cited in *McPherson* v. *State,* 187 Ark. 872, 63 S. W. 2d 282. *In Bowman* v. *State,* 93 Ark. 168, 129 S. W. 80, Mr. Justice Hart cited the opinion written by Chief Justice English in *Sweeney* v. *State,* 35 Ark. 585, to the effect that the record could be amended by order *nunc pro tunc* made in the trial court while the appeal was pending in this court, and the amended record could then be brought to this court by *certiorari.* Such was the practice pursued in the case at bar. In *Goddard* v. *State,* 78 Ark. 226, 95 S. W. 476, this court, speaking through Mr. Justice Riddick, held that a *nunc pro tunc* order could supply the omission in the original record to show that the jury was sworn. We, therefore, conclude that the *nunc pro tunc* proceedings of November 12, 1946, cured the omissions in the original record in this case.

II. *Qualifying of Certain Prospective Jurors.* Two of the veniremen—C. A. Cummings and W. E. Townsend—after having been held qualified by the trial court over the objections and exceptions of the defendant, were peremptorily excused by the defendant, whose peremptory challenges were afterwards exhausted prior to the completion of the jury. This exhaustion of the peremptory challenges before completion of the jury allows the defendant to question here the correctness of the ruling of the trial court in qualifying each of these prospective jurors. *Collins* v. *State,* 102 Ark. 180, 143 S. W. 1075. But, when we attempt to ascertain whether the trial court erred in holding the prospective jurors to be competent, we are met by the fact that we do not have the full record of the examination of each such prospective juror. On all other matters, the bill of exceptions is complete; but on the examination of the jurors, the record shows on its face that it is not complete. As regards Cummings, the record recites:

"Mr. C. A. Cummings, a prospective juror, after being first duly sworn to answer questions touching his qualifications, testified *in part* as follows: . . . " (italics our own).

Likewise, as to Townsend, the record discloses:

"Mr. W. E. Townsend, a prospective juror, after being first duly sworn to answer questions touching his qualifications, testified *in part* as follows: . . . " (italics our own).

Thus, insofar as these prospective jurors are concerned, we do not have *all* of the questions asked or *all* of the answers given by either of them. In *Mathews* v. *State,* 84 Ark. 73, 104 S. W. 928 the bill of exceptions showed on its face that it did not contain *all* of the evidence and we there said: "We are precluded by this statement from inquiring into the sufficiency of the evidence to sustain the verdict of the jury all of the evidence adduced at the trial not being before this court."

The same rule applies with equal force to the ruling of the trial court on the qualifications of prospective jurors. The language used by Chief Justice McCulloch in *West* v. *State,* 150 Ark. 555, 234 S. W. 997 is apropos:

"The examination was had by the trial judge, and he was in situation to correctly determine whether or not the jurors entertained settled or fixed opinions which would likely influence them in the trial of the case. A due amount of deference ought, under the circumstances, to be given the finding of the trial judge on that issue, and his conclusions should not be discarded unless it appears that he erroneously accepted a juror who had a fixed opinion on the merits of the case, based on a narrative of facts traceable to a definite source and not based merely on rumor. *Hardin* v. *State, supra* (66 Ark. 53, 48 S. W. 904); *Reynolds* v. *United States,* 98 U. S. 145, 25 L. Ed. 244."

So, in the absence of all the examination, we cannot determine from the record that either prospective juror was erroneously qualified.

III. *The Sufficiency of the Evidence.* The defendant was accused of the murder of Thomas Lee Dugan. The proof showed that at about 11:00 p. m. on Saturday, June 22, 1946, defendant called a taxicab in Mena, Arkansas.

The deceased, Dugan, was a taxicab driver, and—accompanied by a young woman named Mrs. Billie Edwards—responded to defendant's call. The young woman professedly had never seen the defendant prior to that time. The defendant agreed to pay Dugan $15 to be transported from Mena to DeQueen; and the three started on the trip. Dugan and the young lady were on the front seat, and the defendant was on the back seat. Before they reached DeQueen, the defendant changed his mind as to his destination, and persuaded Dugan to return towards Mena, and then leave the highway and travel several miles over neighborhood roads, ostensibly to go to the home of defendant's sister. Finally, defendant had the car stopped and alighted to see if he could locate any familiar landmarks. He went a short distance back of the car, and Dugan went to see what the defendant was doing. The young woman remained in the car, and could hear "mumbling," but could not hear the conversation between the defendant and Dugan. The defendant then shot Dugan, who staggered back and fell in the car, pursued by the defendant, who shot Dugan twice in the back before he expired. In all, defendant fired five shots into Dugan's body.

After some alleged threats by the defendant, the young woman held the flashlight while the defendant dragged Dugan's body into the bushes, rifled the pockets of his clothes, and took a purse containing over $50. Defendant also wiped up the blood from the car, tore off the "for hire" signs, and told the young woman that he had to kill Dugan to get the car in order to escape from the officers, as he was sought for another offense. At all events, defendant did use the car in an attempt to escape, but was apprehended the following day, while still accompanied by the young woman.

Defendant admitted the killing, but pleaded self-defense, claiming that Dugan threatened him in the conversation behind the car, and that defendant believed Dugan was going to the car to obtain a gun. A search later revealed that there was no gun in the car. The State claimed that the defendant not only killed Dugan

with premeditation and malice aforethought, but also killed him in the commission of robbery—*i. e.,* the stealing of the car. From this brief synopsis, it is clear that the evidence offered was sufficient to sustain the verdict.

IV. *The Instructions.* The trial court gave the usual instructions fitting such a case; and we find no error in any of them. The defendant insists most vigorously that the trial court committed error in instructing the jury both as to killing with premeditation and malice aforethought, and also as to killing in the commission of robbery; it being the defendant's contention that he was only being tried for killing in commission of robbery, and not for killing with premeditation and malice aforethought. The defendant's contention is settled adversely to him by the case of *Noble* v. *State,* 195 Ark. 453, 112 S. W. 2d 631. The rule of law announced in that case answers the defendant's contention here made.

V. *Statements to a Sheriff.* On one occasion shortly after being arrested, the defendant was being transported in a car by Sheriff John Howell of Howard county; and Sheriff Howell testified to this conversation at that time:

"A. I asked him about the killing of the boy and he said he did it. I asked him why he had killed the boy and he said, "Well,' he was 'hot' in Mena and the officers were looking for him and he had to get away; that he had just been released some time before from the penitentiary in North Dakota; and that he had to have an automobile to get away with.

"Q. Did you ask him anything about any trouble he might have previously had with Lee Dugan?

"A. I asked him about that and why he had killed the boy. He just said that he had to have an automobile and there had been no argument or anything take place."

These statements to Howell, and others of a similar nature, were objected to by the defendant, as made to an officer while under arrest and at a time when the defendant was not informed of his constitutional rights.

We hold the trial court committed no error in admitting Howell's testimony and other testimony of a similar nature. What was said on this point in *Thomas* v. *State, ante,* p. 398, 196 S. W. 2d 489, applies here. Statements freely and voluntarily made are admissible; and the conversation between Sheriff Howell and the defendant was in that category.

VI. *Comments by the Trial Court as to Certain Evidence.* The state called the young woman, Mrs. Billie Edwards, as a witness. The prosecuting attorney had previously obtained a statement from her as to what her testimony would be. On cross-examination of this witness, the following occurred:

''Q. Was that a sworn statement?

''A. Yes.

''Mr. Quillin: Your Honor, we would like to call upon the Prosecuting Attorney to let us see that statement.

''The Court: You have asked the Court to order the Prosecuting Attorney to turn over to you a statement that this woman made to him. The Court is refusing to do that.

''Mr. Quillin: We except.

''Mr. Norwood: I know Your Honor's ruling, but we want to make this further request for the further reason that 'The Star' undertook to publish these statements. We read those statements; and when we come here she makes statements we have never heard of before. Then, I think the best evidence is her written sworn statement.

''The Court: *The best evidence is what she is giving you now from the witness stand.* If they hadn't brought her here, then you would be demanding the best evidence.''

(Mr. Quillin, continuing:—)

"Q. Mrs. Edwards, are you testifying to today exactly the same things you told the Prosecuting Attorney in that written statement?

"A. Yes.

"Q. Have you told everything today that you told in that statement?

"A. I probably went into more details in it.

"Q. Did you tell him all of the fundamentals that you have told here today?

"A. Yes.

"Mr. Quillin: Your Honor, since we have her on cross-examination, I think that lays the foundation to produce that statement for impeachment purposes.

"The Court: *I can't help what you think, the Court disagrees with you.*

"Mr. Quillin: We except."

(Italics in the above excerpt are our own, as subsequently explained.)

(A.) The defendant complains of the refusal of the court to require the prosecuting attorney to show Mrs. Billie Edwards' statement to the defendant in advance of the trial. We fail to see why the state should furnish the defendant with a statement made by the witness to the prosecuting attorney. No authority is cited to sustain such a position, and we know of none. The prosecuting attorney had taken a statement from Mrs. Billie Edwards before calling her as a witness. The defendant had just as much right to interview the witness, and take a statement in advance of the trial.

(B.) The defendant contends that the remarks of the trial court as first italicized above (*i. e.,* "The best evidence is what she is giving you now from the witness stand,") were a comment on the weight of the evidence, in violation of Art. VII, § 23 of the Constitution. When the whole excerpt is read, it is clear that the court was not telling the jury that the testimony of this witness was the best and most trustworthy evidence in the entire case.

What the court was saying, was that the testimony of the witness from the witness stand, rather than the sworn statement she had previously made, was the competent testimony of this particular witness. The court used the words "best evidence" just as the law books use the words—*i. e.,* primary evidence as distinguished from secondary evidence. In 20 Am. Jur. 363 in the chapter on "Best and Secondary Evidence," this appears:

"It is an elementary principle of the law of evidence that the best evidence of which the case in its nature is susceptible and which is within the power of the party to produce, or is capable of being produced, must always be adduced in proof of every disputed fact. Secondary evidence is never admissible unless it is made manifest that the primary evidence is unavailable, as where it is shown that it has been lost or destroyed, . . . "

We are convinced that the trial court used the expression, "best evidence," just as it is used in the quotation above, and not in the light of commending the witness to the jury, as was done in *Williams* v. *State,* 175 Ark. 752, 2 S. W. 2d 36. So, we hold that the first italicized words were not a comment on the weight of the evidence.

(C.) The defendant contends that the second italicized remark of the court (*i. e.,* "I can't help what you think, the Court disagrees with you"), was unduly harsh and prejudicial. We think this remark by the trial court comes within the purview of the cases of *Vasser* v. *State,* 75 Ark. 373, 87 S. W. 635; *Tuttle* v. *State,* 83 Ark. 379, 104 S. W. 135; *Benson* v. *State,* 112 Ark. 442, 166 S. W. 549; and *Bridger* v. *State,* 122 Ark. 391, 183 S. W. 962, where we held that somewhat similar remarks were not sufficient to constitute reversible error.

VII. The *Evidence of Mrs. Roxie Bruce.* The defendant called as a witness his sister, Mrs. Roxie Bruce, to testify as to when and where the defendant was born, how many children in the family, and the domestic and financial conditions prevailing in defendant's childhood. The court sustained an objection to all of this evidence; and that ruling is assigned as error: We are not required

to decide whether any of this evidence was relevant and competent, because (a) the trial court later permitted Mrs. Bruce to testify as to the paucity of defendant's education, and (b) the trial court permitted the defendant to testify as to his early life, environment, etc. So, even if the court was in error in excluding Mrs. Bruce's first testimony—which point we do not decide—nevertheless, the court later allowed the evidence to come into the record, and thereby cured any possible error in the earlier refusal.

VIII. *The Conduct of the Trial Judge.* In the motion for new trial, the appellant, for the first time, mentioned that the trial judge was disqualified by reason of previous participation. The foundation for this assignment was laid by defendant's counsel in the state's cross-examination of defendant. The prosecuting attorney had a written statement from the defendant in the form of questions and answers. The circumstances leading to, and the reasons for, the making of such questions and answers were not shown. These questions and answers were not introduced by the state in its case in chief, but the prosecuting attorney, on cross-examination of the defendant, several times asked him if he had not stated a certain fact. Finally, this occurred:

"Mr. Quillin: Wait just a minute. If Your Honor please, we want to again renew our request that the Prosecuting Attorney be required to read that entire statement to the jury.

"Mr. Steel: If the Court please, let me make a statement.

"The Court: He requests you to read the statement to the jury, and the Court is not objecting.

"Mr. Steel: I didn't want to introduce it in the record, because I thought it would be a reversible error in the Supreme Court to do so. It is being read to the jury at the specific request of the defendant.

"Mr. Quillin: Of course, Your Honor, it should be introduced in the record before it is read in the record.

"The Court: The defendant has asked that it be read to the jury."

Thereupon, the said questions and answers· were read to the jury; and it was disclosed that the trial judge had been present and interrogated the defendant at the time of these questions and answers, which was some four or.five days after the defendant was arrested. There is nothing in the record to indicate that the defendant made the answers other than entirely voluntary; and no explanation was made as to why the trial judge was present and assisted in the interrogation of the defendant. The presence of the trial judge could have been in the line of his judicial duties, that is, these questions and answers could have been in a *habeas corpus* proceeding to consider bail, or they could have been in a hearing to see if the defendant should be committed to the State Hospital to determine his sanity. In the absence of any definite proof, we refuse to join the defendant's counsel in speculation. If the trial judge had been guilty of any impropriety in being present when the defendant was being interrogated, such impropriety should have been made to appear by some degree of proof, rather than left entirely to innuendo and speculation—as is the case here. The trial judge's participation in a previous proceeding would not, *ipso facto,* render him disqualified to preside at this trial of the defendant. See 30 Am. Juris. 790.

Furthermore, we point out that it was not until the motion for new trial that the defendant raised any question about the participation· of the trial judge in the previous interrogation as constituting any grounds for disqualification. Under the circumstances in this case, such motion came too late. Appellant, having been interrogated by the trial judge on the previous occasion, certainly knew of such fact before and at all times during the trial. When the questions and answers were brought into the record by defendant's insistence, then, certainly, that was the time to raise the question of the judge's disqualification. In the recent case of *Byler* v. *State, ante,* p. 790, 197 S. W. 2d 748, in discussing waiver of

disqualification of a judge by proceeding after knowledge thereof, we said:

"If appellant had been aware of this fact before the trial, he could not thereafter raise the question, as the law would not allow one to speculate on the outcome of the trial, and thereafter take advantage of a fact known to, but not raised by him until after an adverse verdict had been returned. *Morrow* v. *Watts*, 80 Ark. 57, 95 S. W. 988."

In the case at bar it was not shown that the trial judge was disqualified, and furthermore the point was not raised in apt time, and was waived.

We have examined the entire record, and all objections, and find no reversible error; so the judgment is in all things affirmed.